### DICKINSON et al. v. SAUNDERS et al.

#### (Circuit Court of Appeals, First Circuit. April 13, 1904.)

#### No. 516.

**1. FOREIGN CORPORATION—DECREE APPOINTING RECEIVERS CONSTRUED.**

A decree appointing receivers for a foreign corporation, and directing that they continue to operate the property until otherwise directed, and from the moneys coming into their hands pay all sums due to employés and all expenses of carrying on the business, construed, under the circumstances, as requiring the receivers to pay from the proceeds of the corporation's property all claims for wages earned prior to their appointment, as well as wages earned thereafter.

**2. SAME—PRIORITY—WAGES OF EMPLOYÉS.**

Where a federal court could have acquired jurisdiction to appoint receivers for a foreign corporation only by consent of the parties, and no objection was made by any party to such appointment, or to a decree requiring the receivers to pay from the proceeds of the corporation's property all sums due employés, together with all the expenses of carrying on the business, the receivers could not thereafter, under the circumstances of this case, refuse to pay in full claims for wages earned by employés of the corporation prior to the receivers' appointment, none of which exceeded $300 in amount, in preference to other unsecured claims.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

Guy Cunningham, for appellants.

Henry T. Lummus (Charles N. Barney, with him on the brief), for appellees.

Before PUTNAM, Circuit Judge, and ALDRICH and BROWN, District Judges.

PUTNAM, Circuit Judge.  This appeal arose out of a bill in equity filed in the Circuit Court for the District of Massachusetts on the 7th day of August, 1902, by the Boston & Gloucester Steamboat Company and others against the Cape Ann Granite Company, incorporated under the laws of Maine, but said to have a usual place of business at Gloucester, in Massachusetts.  The bill alleged that the Cape Ann Granite Company in March, 1894, executed a mortgage of its franchises and all its property to secure an issue of bonds, and that all the complainants were holders of portions thereof, either absolutely or as collateral security, and also of certain shares of capital stock;

that the mortgage was in default; that the defendant corporation had an amount of property of various kinds, and was largely indebted; that its property had been attached by various creditors; that the corporation was wholly insolvent, and that it was likely that a race of diligence would ensue between its different creditors, all of which would result in a multiplicity of suits, and in dismemberment and sale of its property by piecemeal and at a sacrifice; that its personal property, consisting principally of machinery and equipment, was of great value as attached to and part of its plant, but of little value when separated therefrom, and that the value of all its property consisted largely in its continued working operation as a unit; and that it was necessary,, for the protection of its bondholders and creditors and for the preservation of its assets, that all its property within the jurisdiction of the court be taken into its judicial custody by the appointment of a receiver. Thereupon the bill prayed that the rights of the parties in interest might be ascertained and protected; that the court would administer the entire property of the corporation, and for such purposes would marshal its assets and enforce the various rights, liens, and equities; and that a receiver be appointed to take possession of all the assets, with authority to manage and preserve the same till the same should be sold and the proceeds distributed.

Thus the bill looked not merely to a foreclosure of the mortgage in which the complainants were interested, but to a winding up and distribution of the assets of the corporation, and the consequent intervening control and management of its affairs, with the view of making its assets of most available value. Thereupon, the same day the bill was filed, the appellants were appointed interlocutory receivers as prayed by the bill, and were authorized to retain possession of all the properties until sold, and to operate and continue the business until otherwise directed, and from the moneys coming into their hands to pay all sums due to employés and all expenses of carrying on the business. No objection to these proceedings seems to have been taken from any quarter, so that we have no occasion to consider any question except that which is now expressly before us.

Subsequently to filing the bill, on May 16, 1903, certain petitioners intervened, setting forth that they were "workmen and servants" employed by the defendant corporation during April, May, June, July, and August, 1902; that they had claims against it for the various amounts stated in the schedule attached to the petition, as wages earned during the months specified for labor necessary to its business from day to day; that the claims were contracted as a part of current expenses in the ordinary course; that the receivers had sold and converted into cash a large amount of personal property which was not covered by the mortgage in question; that they had applied none of the same to the payment of the claims of the petitioners, and had refused to do so; and that it was likely that the property and money remaining in their hands, if distributed among all the unsecured creditors, would be insufficient to pay in full. Thereupon they prayed that their claims might be allowed as

129 F.—2

preferred, and have priority over all other unsecured claims, and that, so far as the petitioners were entitled to priority, the receivers might be ordered to pay them.

The receivers put in an answer to this petition, and objected to the granting thereof. There is nothing in the record showing a diversion of assets as alleged. With that exception, the case rests on the substance of the petition as we have given it. The court decreed that the debts of the petitioners should be allowed as preferred, and that the receivers should pay the same. From this decree the receivers seasonably appealed.

It does not appear that the assets of the defendant corporation have ever been disposed of under the form of a decree of distribution, but it is admitted that some of the property not covered by the mortgage has been sold by the receivers and converted into cash, which at the time of the filing of the intervening petition was in their hands. It also appears that thus the receivers have in their hands a sum, not bound by the mortgage, sufficient to pay the petitioners in full, but that such payments, if made, would leave almost nothing for the other unsecured creditors. The claims allowed by the court cover a period of something more than four months prior to the appointment of the receivers, and the total of some of them was in excess of $100, but none in excess of $300. The learned judge of the Circuit Court filed no opinion, so that the grounds on which he made his decree are not before us.

The record presents no equity in behalf of the intervening petitioners, other than that they were workmen. The defense rests on the ground that their claims differ in no way from any of the unsecured liabilities to which they ask to be preferred. The proposition is also made that the defendant is not a quasi public corporation, the continued operation of which is of general interest. The receivers maintain that the decisions of the Supreme Court allowing priorities relate to corporations which owe duties to the public, on which account, in order that there may not be a cessation of the performance thereof, they say special concessions have been made.

There have been numerous voluminous opinions of the Supreme Court with reference to priorities involved in the administration of the property of quasi public corporations like railroads, which it would be laborious and unnecessary to digest and classify. A late general statement of them will be found in Southern Railway Company v. Carnegie Steel Company, 176 U. S. 257, 20 Sup. Ct. 347, 44 L. Ed. 458. It is true that, so far as such corporations are concerned, the court has said that, inasmuch as they owe duties to the public, their mortgagees acquiring security thereon do it with the implied equitable undertaking on their part that no summary action by them shall interfere with the performance of such duties. Therefore it has been said that if mortgagees, instead of relying upon their strictly legal rights and legal remedies, see fit to go into equity, they must consent to equitable terms in reference thereto. In the same way the court has recognized another equity in behalf of indebtedness created from hand to mouth in favor of laborers, mechanics, and dealers supplying material for day to day operation, to the effect that, if mortga-

gees, after a railroad corporation becomes insolvent, accept payment of interest, and allow to be applied thereto moneys which ought to have been used in disbursing the cost of the operation of the property, another equity arises, by virtue of which what has thus been taken from the immediate hand to mouth creditors shall be restored to them. But the equity which is claimed here is of an entirely different character. It is simply a question between different classes of unsecured creditors; that is, between those who, on the one hand, are understood to give credit, and those who, on the other, furnish labor with no intention of credit, but with the expectation of immediately being paid from day to day out of the accruing earnings of the property. Therefore the questions arise whether there is such an equity, and, if yes, what is its extent? This equity, if it exists at all, is, of course, applicable to all classes of employers whose property comes into the hands of chancery for administration.

Some courts recognize this equity. Perhaps it never has been put better than in Jones v. Arena Publishing Company, 171 Mass. 22, 50 N. E. 15. The opinion in behalf of the majority of the court said at pages 27 and 28, 171 Mass., and page 16, 50 N. E., as follows:

"The questions whether taxes and debts due to workmen for labor are entitled to priority may be considered together. The relief sought is merely the getting in and the distribution of what are known in equity as 'legal assets.' In the course of the administration of assets, courts of equity follow the same rules in regard to legal assets which are adopted by courts of law, and give the same priority to the different classes of creditors which is enjoyed at law; thus maintaining a practical exposition of the maxim, 'Æquitas sequitur legem.'

"It would be a plain injustice if a general creditor, by resorting to equity for the administration of his debtor's goods, merely for the reason that by the aid of equity the amount to be divided would be larger, could gain a further advantage by reducing to the level of common creditors workmen whose wages would have priority if the assets were left to be administered at law, or could thus place his own debts upon an equality with taxes which would have been paid in full had not equity interfered. The defendant corporation was subjected to our insolvency law by force of St. 1890, c. 321; and, if equity had not come in to conserve and distribute its legal assets, the wages of its workmen and the taxes due from it would have priority in the distribution of its assets by the usual agencies of common law. Those agencies could not keep its business going at the time when the bill was filed. For this reason only, the creditors, merely to increase the amount of the fund, asked equity to interfere in behalf of all creditors alike. It would be unjust if that interference should be at the sole cost of the workmen and of the public, through depriving claims for labor and taxes of the priority of payment which they would have had if equity had not intervened."

At the time the decree appealed from was made there was an existing statute in Massachusetts, now found in Rev. Laws 1902, c. 150, § 29, as follows:

"The following claims shall, in the settlement of estates by receivers, be entitled to priority in the order named:

\*    \*    \*    \*    \*    \*    \*    \*    \*

"Second. Wages to an amount of not more than one hundred dollars due to an operative, clerk or servant for labor, either performed within one year last preceding the appointment of the receiver or for the payment for which a suit, which was commenced within one year after the performance of the labor, is pending or was terminated within one year after said appointment."

The bankruptcy act of July 1, 1898, c. 541, § 64b, 30 Stat. 563 [U. S. Comp. St. 1901, p. 3447], provides priority for wages due to workmen, clerks, or servants, earned within three months before the date of the commencement of proceedings in bankruptcy, not to exceed $300 to any claimant. Turning, therefore, either to the local statute, or to what, for the federal courts, is the higher authority, a priority in favor of creditors of the class of the interveners in this case is declared as a rule of administration, not only for quasi public corporations, but for all corporations, and in the federal statute for corporations and individuals. Although the statute of the state of Massachusetts could not, of course, control proceedings in the federal courts, and undoubtedly had no direct relation to receivers appointed by those courts, and although it may be possible for the appellants to claim that this particular corporation was not within the classes of corporations subject to proceedings under the bankruptcy statutes, yet each legislative system declares a policy which a chancellor, in hunting about for some analogy to guide the equitable administration of his office, might lay hold of under some circumstances. While not strictly bound by either, he might be justified, if his duty required it, in taking into consideration each or both in disposing of a question like that before us.

Judicial discretion, it is true, is subject to rules, and not arbitrary. It must, of course, be governed by reasonable considerations, and is so far from involving pure discretion that it may be reviewed on appeal. The present case, however, is peculiar in such substantial respects that it does not require that we should sharply determine the questions suggested; and it affords little opportunity for our revising the action of the Circuit Court, unless clearly unreasonable. The defendant corporation having its habitat in Maine, the Circuit Court for the District of Massachusetts had, according to well-settled rules, no jurisdiction over a bill of the character in question, unless by consent; and that it took jurisdiction implies that it was by the consent, and, indeed, it may be said at the request, of all the parties to the proceeding. No one intervened to object thereto. The statutes of the state of Maine, where this corporation was created, provide precise and peculiar methods for winding it up and distributing its assets, which neither contemplate nor authorize a proceeding of the kind instituted in the Circuit Court. Neither do the statutes of Massachusetts provide for proceedings of this character with reference to foreign corporations. Neither was the case framed to come within the eighth section of the act of March 3, 1875 (18 Stat. 472, c. 137), providing specially for the administration of real or personal property within the district. The extent to which the authorities have given federal courts jurisdiction in their own right with reference to winding up corporations or marshaling their assets is in instances where the state statutes provide for their dissolution, and for equitable proceedings for that purpose, which, of course, may be adopted by the federal courts, as in Terry v. Commercial Bank of Alabama, 93 U. S. 454, 23 L. Ed. 620, and in Mellen v. Moline Malleable Iron Works, 131 U. S. 352, 9 Sup. Ct. 781, 33 L. Ed. 178, or in instances of ordinary creditors' bills after judgment and execution returned nulla bona, like Central Trust Company v. McGeorge, 151 U.

S. 129, 14 Sup. Ct. 286, 38 L. Ed. 98, or in instances when called on to collect and dispose of the assets of dissolved corporations, domestic or foreign. The case, therefore, against the Cape Ann Granite Company, as made in the Circuit Court, was purely of the parties' own selection, as well as was the tribunal itself.

But in this case the distinctive feature is that the decree appointing the receivers contained the following direction which we have already stated, namely: "From the moneys coming into their hands to·pay all sums due to employés and all expenses of carrying on said business." That the expression "sums due to employés" means the very sums in controversy here, follows logically from the fact that all wages due them, accruing after the appointment of the receivers, were covered by the words "all the expenses of carrying on said business." Therefore the expression "all sums due to employés" means sums due at the time of the decretal order appointing the receivers, and which accrued before it. It has for a long time been customary, where parties apply for interlocutory receivers of a going concern, for the court to insert some provision of this character in the decretal order appointing them. Sometimes this is done at the motion of the court or of one of the adversary parties. Under such circumstances, some of the observations in Kneeland v. American Loan & Trust Company, 136 U. S. 89, 10 Sup. Ct. 950, 34 L. Ed. 379, apply, so that, even though the order appointing interlocutory receivers designates certain rights of priority, this will not justify an unreasonable exercise of judicial power in reference thereto.

The present record, however, shows that the decretal order appointing the receivers was summarily entered on the same day with the filing of the bill against the defendant corporation; and inasmuch as, for the reasons we have already stated, the proceedings under the bill must have been by the consent of all concerned, it is a reasonable interpretation of the record that the decretal order, and all the terms thereof, were simultaneously assented to by all concerned. Under those circumstances, the observations in Kneeland v. American Loan & Trust Company have no pertinency, unless there was a clear mistake or clear injustice, or unless it appeared that new parties, having an interest not represented before the court when it took jurisdiction and appointed the receivers, had subsequently intervened. Nothing of either kind appears here. So far as the record shows, the parties to it are the same who came into the court originally and voluntarily agreed to all that occurred. The proceeding was therefore purely voluntary on all sides. The complainants in the original bill in the Circuit Court must be assumed to have understood the probability that, unless a provision like that which we have cited was inserted in the decree, the corporation might be held to be within the statutes of bankruptcy, and proceeded against accordingly, in which event substantially the .same priorities would have been acquired as are now sought to be enforced. We must therefore hold that it is in harmony with the reason of the case, and with the probable intention of the parties, that the provision which we have cited from the interlocutory order appointing the receivers, with reference to "sums due to employés," is to be construed as we construe it. As we have already said, we must hold that this ex-

pression was voluntarily assented to. It follows that, as parties to the original proceeding have got whatever advantages they could out of it, they must accept the consequential burdens.

It is not essential that the bankruptcy statutes were not strictly applicable to this defendant corporation, if such were the fact. It is sufficient that there was a probability that they were. The same is true as to the fact that the time limit in those statutes for preferred wages is three months, while the limit in the case at bar appears to have been four. No amount allowed any employé by the order appealed from was equal to the maximum permitted by the statutes, so that, merely on account of the departure as to length of time, it cannot be said that the policy declared by Congress is inapt or was not sufficiently regarded. Taking this analogy in connection with the peculiar circumstances of this proceeding to which we have referred, including the provision which we have cited from the decretal order appointing the receivers, and the circumstances under which it was assented to, it is impossible for an appellate tribunal to find that there was anything unjust in the requirement of the Circuit Court that that provision should be literally and fully complied with.

Therefore, without definitely deciding that the rules with reference to receivers of corporations of a quasi public character can be properly extended to other employers, we are required by the peculiar circumstances of the case before us to affirm the decree of the Circuit Court. In this we reach, under substantially the same circumstances, the same conclusion as was arrived at by the Circuit Court of Appeals for the Fifth Circuit, with reference to a corporation organized for mere private gain, in Reinhart v. Augusta Min. & Inv. Co., 94 Fed. 901, 36 C. C. A. 541.

The decree of the Circuit Court is affirmed, and each party will pay its costs on appeal.