McROBERTS et al. v. INDEPENDENT COAL & COKE CO. et al.*

SAME v. TONKIN.

(Circuit Court of Appeals, Eight Circuit. October 7, 1926.)

Nos. 7177, 7178.

**1. Corporations ⊜⟹319(5).**

Other directors of corporation *held* not necessary parties to director stockholder's suit against corporation and intended purchaser of all its assets to cancel sales contract and enjoin parties from carrying it out.

**2. Corporations ⊜⟹319(5).**

Company whose assets were to be purchased by intended purchaser of assets of particular corporation *held* not necessary party to suit against that corporation and such intended purchaser to cancel sales contract and enjoin parties from carrying it out.

**3. Courts ⊜⟹344—Minority stockholder's suit to enjoin sale of assets of solvent corporation held maintainable on constructive service in federal court of district where property was located other than corporation's domicile (Judicial Code, § 57 [Comp. St. § 1039]).**

Contract to sell all assets of solvent corporation, made without consent of minority stockholders, being only voidable, not void, *held* a cloud on corporation's title to its property, and hence suit to cancel such contract and enjoin corporation and intended purchaser from carrying it out was maintainable on constructive service in federal court in district where property was located, though other than corporation's domicile, under Judicial Code, § 57 (Comp. St. § 1039).

**4. Corporations ⊜⟹388(3).**

Corporation as such is estopped to deny validity of contract for sale of all of its assets ratified by majority stockholders.

**5. Corporations ⊜⟹189(11).**

Bill in minority stockholder's suit to enjoin sale of all of corporate assets, alleging corporation was not insolvent, that minority stockholders had not consented to sale, and that payment was to be made in part in stock of new company, *held* sufficient on motion to dismiss.

*Rehearing denied January 15, 1927.

Appeal from the District Court of the United States for the District of Utah; Tillman D. Johnson, Judge.

Suit by William G. McRoberts, as trustee, and others against the Independent Coal & Coke Company, John H. Tonkin, and others. Motions of the named defendants to dismiss were sustained, and plaintiffs bring separate appeals. Decrees reversed, with instructions.

Helm Bruce, of Louisville, Ky. (Joseph A. Weil, of Peoria, Ill., and Benjamin S. Crow, of Salt Lake City, Utah, on the brief), for appellants.

Mahlon E. Wilson, of Salt Lake City, Utah (Albert R. Barnes, of Salt Lake City, Utah, on the brief), for appellees.

Before STONE, KENYON, and BOOTH, Circuit Judges.

STONE, Circuit Judge. These are appeals from dismissal of a bill in equity.

This is a bill by several stockholders of the Independent Coal & Coke Company against that company and John H. Tonkin to cancel an option and contract for the sale of all of the assets of the company to Tonkin and to enjoin the company and Tonkin from carrying out such contract.

To the amended bill, separate motions to dismiss were filed. The one as to the company was based upon the grounds following:

"(1) That it affirmatively appears from the face of the complaint that if any cause of action is stated in favor of the plaintiff and against this defendant that it is a cause of action relating to the internal affairs and management of this corporate defendant; that this corporate defendant is shown by the face of the complaint to be a corporation organized and existing under the laws of the state of Wyoming, and is as to the state of Utah, and as to the federal District of Utah, a foreign corporation; that this court has no jurisdiction to in any wise regulate, supervise, manage or interfere with the internal affairs of this defendant; and that neither any of the plaintiffs nor this defendant are or ever have been, inhabitants of this District.

"(2) That it is shown upon the face of the said bill of complaint that the transaction which is sought to be annulled and canceled by the complaint, is one that was ratified by vote of more than two-thirds of the outstanding capital stock of the corporation defendant, which ratification and vote was made and taken at the office of the company at Evanston, Unitah county, state of Wyoming; and for that reason this defendant says that the annulment or cancellation of said transac-

tion, if any, is to be had by a court, must be made pursuant to some judicial proceedings in either the state courts of the state of Wyoming or the federal courts for the district of Wyoming; and that this court for the district of Utah is without jurisdiction to hear and determine such proceedings.".

That of Tonkin was based on the grounds following:

"(1) That it affirmatively appears from the face of the bill of complaint that there is a defect and nonjoinder of necessary and indispensable parties to the maintenance and determination of this action, which defect and nonjoinder consists in this, to wit, that said bill of complaint shows upon its face that this corporate defendant is, and at all times mentioned in the complaint was under the management and control of a board of directors, eleven in number; that only three of said directors, to wit, W. G. McRoberts, one of the plaintiffs, and W. B. Reed, one of the plaintiffs, and this defendant are or have been made parties to this action; that the other eight directors have not been made, and are not, parties to this action; that before this action can proceed to a final determination in this court it is necessary and indispensable that said eight directors who have not been made parties shall be made parties, either p. or d. [plaintiff or defendant].

"(2) That there is a nonjoinder and defect of parties in this, to wit, that it appears from the face of the bill of complaint that the Royal Coal Company, a corporation organized and existing under the laws of the state of Utah, is a necessary and indispensable party defendant to a cancellation and annulment of the transaction set forth in the complaint.

"(3) That said bill of complaint does not state facts sufficient to constitute a cause of action against this defendant.".

The motion of the company was sustained because "the court is without jurisdiction to hear the case under the provisions of section 57 of the Judicial Code (Comp. St. § 1039), and consequently is without jurisdiction to hear the said cause as against the Independent Coal & Coke Company."

At the time the above order or decree was entered, Tonkin was given leave to file amendments to his motion. Such amendment added to the original motion the ground following:

"That the court, having heretofore dismissed said bill of complaint against the Independent Coal & Coke Company on the ground that said court is without jurisdiction of said defendant, and it appearing from the face of the bill of complaint that the Independent Coal & Coke Company is a necessary and indispensable party to the maintenance and determination of this action, and that this court has no jurisdiction of said Independent Coal & Coke Company or of the acts as to said company, the said defendant, John H. Tonkin, now moves to dismiss said bill on the ground that this court has no jurisdiction of said Independent Coal & Coke Company or the action against said company, and that therefore it has no jurisdiction to hear and determine this action as against this defendant."

The Tonkin amended motion was sustained without statement of the ground therefor.

These appeals are from the two decrees or orders sustaining these motions and dismissing the bill with prejudice.

The motions, one or both, raise jurisdictional questions as to parties (both present in and absent from the bill) and the sufficiency of the statements of the bill to entitle to equitable relief. The bill states, in substance, as follows:

The complainants are citizens and residents of Illinois and of Kentucky, the company of Wyoming and Tonkin of Utah. The company was organized, in 1906, under the law of Wyoming (with its principal office in that state) for the purposes of doing a general coal and coke mining business. Substantially the entire business of the company, since its organization, has been developing 1968 acres of coal land in Utah and in selling and marketing coal mined therefrom. The business has always been profitable, paying dividends, and the assets, as of January 31, 1925, were over $4,200,000 with about $345,000 total indebtedness and over $376,000 undivided profits. Besides the coal acreage and appurtenant mining machinery, the company owned all of the capital stock of two subsidiary corporations, organized in Utah (one of which was the selling agency and the other the company store) and $200,000 capital stock of a spur railroad connecting the mines with a shipping point. There were eleven directors. The capitalization was 2,500,000 one dollar shares, of which plaintiffs owned 454,480 shares (something over 18 per cent. of the entire stock). Two of the plaintiffs are directors.

Tonkin is a large stockholder, a director, general manager and "during all of said times down to the present time dominated and conducted all the practical administration of the affairs of the defendant corporation, and has been in control of its board of directors."

On December 18, 1924, the board of di-

rectors (the two who are plaintiffs being absent), adopted a resolution that "an option be given to John H. Tonkin covering the property of the Independent Coal & Coke Company for a period of six months from date, at a price of $2,500,000 payable, 50 per cent. in cash and 50 per cent. in preferred stock of a new corporation, or, if necessary, 40 per cent. in cash and 60 per cent. in preferred stock of a new corporation."

Within the six months, Tonkin accepted the option in a letter as follows:

"Salt Lake City, Utah, May 18, 1925.

"The Board of Directors, Independent Coal & Coke Company, Salt Lake City, Utah—Gentlemen: Pursuant to the terms of an option granted me by you upon December 18, 1924, for the purchase of the property and assets of your company for the sum of $2,500,000. I beg to advise you that I am prepared to accept the same, and to pay for it in the following manner, upon the completion of the necessary legal and business formalities to enable them to effect a valid transfer of the title to same:

| | |
|---|---|
| In cash, the sum of one million dollars.... | $1,000,000 |
| In the first preferred 7 per cent. cumulative stock of a company to be organized for the purpose, one million five hundred thousand shares of a par value of one dollar each..................... | 1,500,000 |
| Total ..................... | $2,500,000 |

"The proposed company referred to is simultaneously with the acquirement of your property to purchase the physical property (free and clear of indebtedness) of the Royal Coal Company of Utah, for the sum of one million dollars ($1,000,000) payable as follows:

| | |
|---|---|
| In cash the sum of four hundred thousand dollars ..................... | $ 400,000 |
| In the first preferred 7 per cent. stock above referred to six hundred thousand shares of the par value of one dollar each | 600,000 |
| Total ..................... | $1,000,000 |

"For the purpose of effecting the above stated objects the company referred to will be capitalized and financed as follows:

"First preferred 7 per cent. cumulative stock (nonvoting), interest payable semiannually, to be protected by the usual safeguards placed upon preferred stocks, including a voting right at any time when two interest installments thereon shall be due and unpaid.

"Five million shares of a par value of $1.00 each, of which there shall be issued two million six hundred and forty thousand shares; common stock, one hundred and eighty-seven thousand five hundred shares, of a par value of $1.00 each, of which there shall be issued one hundred thousand shares.

"A first mortgage bond issue, running for twenty years, drawing interest at six and one-half per cent. per annum, payable semi-annually for the sum of $3,000,000, of which there shall be issued $1,600,000.

"The above plan will provide the new company with the following new cash resources:

| | |
|---|---|
| $1,600,000 bonds sold at 92 cents on the dollar ..................... | $1,472,000 |
| 240,000 shares of preferred stock to be purchased by myself and associates at par.. | 240,000 |
| Total ..................... | $1,712,000 |

"To be used as follows:

| | |
|---|---|
| Purchase of Independent Coal & Coke Company ..................... | 1,000,000 |
| Purchase of Royal Coal Company........... | 400,000 |
| Provision for mortgage to state of Utah.... | 112,000 |
| Promotion ..................... | 200,000 |
| | $1,712,000 |

"The preferred stock issued will be used as follows:

| | Shares. |
|---|---|
| Purchase of Independent Coal & Coke Company ..................... | 1,500,000 |
| Purchase of Royal Coal Company........... | 600,000 |
| Purchased by myself and associates for cash | 240,000 |
| Promotion ..................... | 300,000 |
| Total ..................... | 2,640,000 |

"The common stock issued of one hundred thousand shares to go to myself and associates for their services and expenses.

"The annual fixed charges of the new company will be as follows, based upon first year:

| | |
|---|---|
| Interest upon $1,600,000 bonds at 6½ per cent. | $104,000 |
| Amortization of discount on same, 20-year basis ..................... | 6,400 |
| Sinking fund 2½ per cent..................... | 40,000 |
| Sinking fund 8 cents per ton on coal mined and shipped (average 7 years, 1918 to 1924, inclusive, 557,000 tons)..................... | 44,560 |
| Interest upon 2,640,000 shares preferred stock at 7 per cent..................... | 184,800 |
| Total ..................... | $379,760 |

"The average annual earnings of the two companies for the period of 7 years, from 1918 to 1924, inclusive, with an average annual production of 557,000 tons, based upon the present rate of federal income taxes, have been the sum of $437,166.71.

"It is my aim, through the organization of the proposed new company with its provision for further financing through its unissued bonds and preferred stock, to undertake in so far as possible, to stabilize the coal industry of Utah, now in a deplorably unsatisfactory condition, by placing this company in a more important position with increased

production, and the hope thereby of decreased production costs.

"It is my purpose to select my associates as I may see fit; my choice will be from members of the directorate of the companies, the properties of which may be taken over by the new company.

"Yours very truly, John H. Tonkin."

The same day, this letter was presented to a meeting of the board which passed the resolution following:

"Be it resolved that whereas, this company did, on December 18, 1924, authorize the granting of an option to John H. Tonkin, to purchase all of the assets and property of this company, for the purchase price of $2,500,000.00;

"And whereas, it was the purpose of said resolution to enable said Tonkin to organize a new corporation, subsidiary and tributary to this corporation, which new corporation was to own not only the assets of this corporation, 'but was also to acquire, if possible, and own the assets of other corporations engaged in the same general business with this corporation;

"And whereas, the said Tonkin has for some time been engaged in making negotiations for the organization of said new company, and now has, except for matters of detail, the general plans of said new company formulated, and has submitted said general plans to the board of directors of this company at this meeting:

"Therefore be it resolved, that this board does hereby ratify and approve of said general plans, and

"Be it further resolved, that in order to effectuate the carrying out of said plans and the legal transfer of the assets of this company to the new corporation about to be formed by the said John H. Tonkin, that the president and secretary of this company be and are hereby authorized to make and deliver all necessary contracts, conveyances and assignments, preliminary and final, to the said John H. Tonkin as trustee for the said corporation about to be formed; upon the condition that the said Tonkin shall deliver to the treasurer of this corporation $1,000,000 in cash, and $1,500,000.00 in the seven per cent. preferred cumulative capital stock of said new corporation within sixty days from the date hereof; and upon the further condition that said preferred cumulative capital stock to be issued by said new company shall stipulate that no dividend is to be paid on any common stock of said new company until all unpaid cumulative dividends shall have been paid on said preferred stock; and

shall further stipulate that in the event of a dissolution of this new company no common stock shall share in a distribution of any assets until the holders of said preferred stock to be issued by said new company shall have received the full par value of the preferred shares held by them, together with all accrued cumulative dividends due thereon.

"Be it further resolved, that these resolutions shall be submitted to a stockholders' meeting to be held at the office of the company at Evanston, Wyoming, on the nineteenth day of May, A. D. 1925; and said authority herein granted shall become effective and binding upon this company when these resolutions shall have been ratified by the votes of a majority of the capital stock of this corporation."

On May 5th previous, the board had called a special stockholders' meeting for May 19th at which 1,698,583 shares voted to ratify the sale and 620,000 shares opposed. Throughout the above negotiations, the plaintiffs, as stockholders and as directors, vigorously opposed every step of this transaction.

Defendants claim the above constitute a valid and binding contract for the sale of the entire assets of the company and are threatening to and will carry out the same. Such contract is "a cloud upon the title of the corporate defendant to all its property."

"The defendant corporation is a solvent, going concern. The fair value of its assets is more than $2,500,000 in excess of its liabilities (other than its liability to its stockholders). The fair value of its capital stock, the par value of which is $1 per share, is $1.20 per share. It has no bonded indebtedness, and its floating debt could be paid out of its surplus or undivided profits without impairing its capital stock. That no exigency exists requiring the raising of money or the taking of the action hereinbefore stated. It has made net profits in the past and can make them in the future. Already in the present year of 1925 it has declared and paid in cash two quarterly dividends of $1\frac{1}{2}$ per cent. each on its entire capital stock of $2,500,000. Yet, over the objection and against the protest of stockholders owning between one-fourth and one-fifth of the entire capital stock, the board of directors and the majority of the stockholders have undertaken to make a contract with the defendant, Tonkin, himself a director and the general manager of the corporation, whereby all its assets now [wholly] unincumbered, will be conveyed away and its stockholders will only receive for their property 40 per cent. of the par value of their stock in cash, and the remaining 60 per cent.

thereof in the stock of a corporation whose properties will be heavily mortgaged and which stock will have no voting power and no market value, and in order to accomplish this there will be issued to defendant Tonkin and his associates $100,000 of the common stock of this new corporation, which common stock will have the sole voting power and which will thus give to him and his associates the entire control of the new corporation. And in addition to all of this, there will be paid out of the assets of the new corporation for promotion expenses $200,000 in cash and $300,000 in preferred stock, and $128,000 in the form of discount on the sale of its $1,600,000 of bond at 92 cents on the dollar, which is the proposed plan of financing it; so that the setting up of this new corporation will cost $628,000 in cash and preferred stock and $100,000 in common stock, with all the voting power in those who get this common stock for their services."

Plaintiffs have unsuccessfully endeavored to have the board bring an action to vacate and annul the above option and it would be useless to make further efforts to obtain relief from the stockholders or board.

The action is brought in behalf of all other stockholders similarly situated who may join.

### Jurisdiction.

[1-3] The jurisdictional questions relate to the absence of necessary parties (the unnamed directors, the Royal Coal Company and, under Tonkin's amended motion, the Independent Coal & Coke Company) and the presence of a party (the Independent Coal & Coke Company), in the bill, over which it is claimed there was no jurisdiction. The latter question is, really, one of jurisdiction over subject-matter because of the character of reasons asserted for lack of jurisdiction.

The other directors are not necessary parties because this action is not for relief against them, personally or officially, but against the company in its corporate capacity. The Royal Coal Company is not a necessary party because no relief is asked against it and because it is not a party to the transactions involved. The Independent Coal & Coke Company is a necessary party because the relief sought is annulment of a contract to which it was a party. If the motion to dismiss as to that company was properly sustained, then it was proper to dismiss as to Tonkin.

There is no claim of personal service on the company and it appeared specially to challenge the jurisdiction. The claim is that the subject-matter of this action, as shown in the bill, brings it within section 57 of the Code (Comp. St. § 1039) authorizing constructive service. That section authorizes such service where the suit is "to enforce any legal or equitable lien upon or claim to, or to remove any incumbrance or lien or cloud upon the title to real or personal property within the district where such suit is brought." It is urged that this is an action to remove a "cloud upon the title" to real and personal property within Utah. The property is in Utah. The question is whether this action is to remove a cloud therefrom or whether it is merely an action to control the intercorporate relations of stockholders in a Wyoming corporation.

Appellees contend that the case of General Investment Co. v. Lake Shore & Michigan Southern Railway Co., 260 U. S. 261, 43 S. Ct. 106, 67 L. Ed. 244, is controlling. As that case was presented in the Court of Appeals of the Sixth Circuit (269 F. 235) there was no matter of jurisdiction under section 57 of the Code. The sole jurisdictional questions presented and considered in that court were such as concerned the right of a private suitor, who, pleading no pecuniary damage to himself (page 240), was seeking relief solely upon the ground that the public policy of the nation and of the state as to trust combinations was being violated (page 239). In presenting the matter to the Supreme Court, counsel seem to have treated the jurisdictional question as dependent upon section 51 of the Code "as regulating the district in which suits under the anti-trust laws may be brought" (page 279 [43 S. Ct. 114]) and the expressions in that opinion as to section 57 seem rather gratuitous. But that part of the opinion is distinguishable from the present case for that opinion (page 280 [43 S. Ct. 114]) said:

"Obviously the section is confined to suits which are local in the sense of relating directly to specific property, real or personal, within the district of suit or partly therein and partly in another district of the same state. This suit was not within that category. It was not brought to enforce a claim to or lien upon specific property so located, nor to cancel an incumbrance or lien thereon nor to remove a cloud upon the title. On the contrary, as the original bill plainly disclosed, it was brought to enjoin two railroad companies—one having lines both within and without the state in which the suit was begun, and the other having lines without that state —from consolidating, along with nine other companies, into a single corporation. Such a suit is essentially in personam and strictly

transitory, and is not made any the less so by including in the bill, as was done here, an incidental prayer that the consolidation be annulled if consummated pending the suit. So, tested by the original bill, this suit was not one wherein special service could be had under section 57."

·The facts in that case are dissimilar to those here present. In so far as the statement of law therein is to be applied to the facts then under view, that decision goes no further than to declare that a suit under the National Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830) is an action in personam in nature and essence and cannot be changed from that character by inclusion of other incidental matters. The facts in the present bill must be scrutinized to determine whether the present case is within section 57, permitting constructive service.

[4] A conveyance of the property in strict accordance with the contract here set out would undoubtedly be a cloud upon the title of the company to this property. Such a contract is not void until validated but is valid until avoided—it is voidable. It is capable of becoming absolutely valid through ratification or estoppel and the corporation, as such, ·is estopped to deny such validity. Westerlund v. Black Bear Mining Co., 203 F. 599, 611, 121 C. C. A. 627 (this court). If the corporation should attempt to convey to someone else, no attorney would pass such a title with this contract in existence. Such a contract is a cloud upon the title of the most serious character. If it is such a cloud, then the statute gives to anyone injured thereby a right to bring a suit to remove it. The nonassenting stockholders are in that position.

Westerlund Case, supra, page 613 (121 C. C. A. 627). If, on the other hand (as seems to be held in Commerce Trust Co. v. Chandler [C. C. A.] 295 F. 241, 243, First Circuit), a contract to sell all of the assets of a solvent corporation is void, instead of voidable, where there are dissenting stockholders, it is a cloud which even the corporation itself has power to seek to have removed and here plaintiffs allege unsuccessful efforts to secure such action by the corporation.

Under either view, the complaint states fact sufficient to bring it within the character of actions in which constructive service is authorized by section 57. See Citizens' Savings & Trust Co. v. Illinois Central R. Co., 205 U. S. 46, 27 S. Ct. 425, 51 L. Ed. 703; Mellen v. Moline Malleable Iron Works, 131 U. S. 352, 9 S. Ct. 781, 33 L. Ed. 178.

### Merits.

[5] The case of Geddes v. Anaconda Mining Co., 254 U. S. 590, 41 S. Ct. 209, 65 L. Ed. 425, is conclusive in favor of the sufficiency of the bill for the two reasons (stated in that opinion): That the entire assets of a prosperous corporation cannot be sold over the protests of minority stockholders (page 595 [41 S. Ct. 209]) and that, in those instances where assets of a failing corporation can be thus sold, the pay must be in money only or in securities having an established market value (page 598 [41 S. Ct. 209]).

There is no force in the suggestion of appellees that this case has become moot.

The decrees dismissing the· bill are reversed, and the trial court instructed to set aside such orders and reinstate the bill.